**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

MARK A. KOLAKOWSKI                          No.  2:21-cv-574

    Plaintiff,

v.

                                     **JURY TRIAL DEMANDED**

THE WASHINGTON HOSPITAL D/B/A
WASHINGTON HEALTH SYSTEM

    Defendant.

## <u>COMPLAINT</u>

NOW COMES Plaintiff, Mark A. Kolakowski by and through his attorney, Lawrence E. Bolind, Jr., Esquire, and files this Complaint alleging as follows:

### I. Nature of the Action

1.    Plaintiff brings this Complaint to recover damages under 42 U.S.C. §§ 1983 and the right to Free Speech under the First Amendment, in addition to damages caused by violation of various State Tort Laws . Plaintiff was targeted and  retaliated  against by the Defendants, by and through the Washington Health System Police Department employees.

### II. Jurisdiction and Venue

2.    This action arises under 42 U.S.C. §§ 1983 and the First Amendment to the Constitution, in addition to violation of various State Tort Laws .

3.    Plaintiff is a resident and citizen of Pennsylvania, the events or omissions giving rise

to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 28 U.S.C. § 1391.This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331, 1343, and 1367.

### III. Parties

4.      Plaintiff, Mark A. Kolakowski ("Plaintiff"), is an adult individual with a primary residence located in Beaver County, Pennsylvania.

5.      Plaintiff is the elected Constable of Baden Borough, and is also an Act 235 and Act 120 qualified law enforcement officer.

6.      Plaintiff is permitted to carry a service weapon by being certified under Act 49 (Constables) and Act 120 (Municipal Police Officers).

7.      Plaintiff's employment history in law enforcement is as follows: eight (8) years as a police officer in Pennsylvania, and then as a sheriff/police officer for thirteen (13) years in Palm Beach Florida

8.      Plaintiff was also employed in Florida and Pennsylvania as a private subcontractor and in private security for eight (8) years.

9.      Plaintiff returned to Pennsylvania to care for his elderly mother, and for the last six (6) years has been the elected Constable for Baden Borough, Beaver County, in addition to being a

part time Act 120 police officer in Centerville Township, Washington County, Pennsylvania, from March 2019 to the present.

10.     Defendant, The Washington Hospital is a non-profit entity that was organized under the laws of the Commonwealth of Pennsylvania on November 12, 1903. The Hospital has a registered and current business address of 155 Wilson Ave., Washington, Washington County, PA 15301.

11.     Defendant Hospital operates under the trademarked fictitious name Washington Health System, hereinafter named interchangeably as "Defendant," the "WHS," "Washington Health," and the "Hospital."

12.     Defendant Hospital is both an "Employer" and a "Public Body" as those terms are defined by the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421-1428.

13.     Defendant Hospital receives public funds from and through the Commonwealth by virtue of its participation in Medicare, Medicaid, and other government funded health and wellness programs, as well as funding from charitable foundations.

## IV.  Facts

14.     At some earlier unknown date, the Court of Common Pleas of the Washington County, upon application of The Washington Hospital for the appointment of such persons, had appointed Washington Hospital System Assistant Chief Mark Pompe, and Washington Hospital System Chief Bernard Merrick, (both employees of The Washington Hospital), to act as an Act 501

special police officers for The Washington Hospital. *See generally*, <u>*Act 2004-205*</u> (S.B. 871), P.L. 1603, § 1, approved Nov. 30, 2004; Title 22 Pa.C.S. §501.

15.     Policemen so appointed for a corporation organized for the prevention of cruelty to children or aged persons, or one or more of such purposes, shall severally possess and exercise all the powers of a police officer in any county in which they may be directed by the corporation to act, and are hereby authorized to arrest persons for the commission of any offense of cruelty to children or aged persons.  *See*, Title 22 Pa.C.S. §501.

16.     Plaintiff suffered  a significant loss in income due to closing of the courts because of the Covid Pandemic, and was seeking comparable law enforcement employment and applied to the Hospital for employment as an Act 501 policeman.

17.     On Thursday, April 23, 2020, Plaintiff was notified by Hospital's human resources department that he would be interviewed in person, and also via telephone and email.

18.     On Tuesday, April 28, 2020, Plaintiff had an in person interview with the following Hospital employees: Mike Edgar (Hospital human resources), Assistant Chief Pompe, and Chief Merrick.

19.     Assistant Chief Pompe informed Plaintiff before the meeting that getting a schedule that was suitable for Plaintiff's situation would be no problem and that Plaintiff could work the day shift with Sundays and Mondays off.

20.     However, after speaking with Chief Merrick, a totally different scheduling scenario

was revealed.

21.     Chief Merrick pointedly asked if Plaintiff knew one the Hospital's former special police officer employees, Bill Menke.

22.     Plaintiff admitted that he knew Menke professionally through being Plaintiff being a constable.

23.     Chief Merrick described an incident involving Menke while employed with the Hospital, and instructed Plaintiff not to have any contact with Menke.

24.     After the Plaintiff stated that he knew Menke, Chief Merrick instantly said that the schedule that the assistant chief had offered was no longer available, but that Plaintiff would work one or two days a month maximum, as a temporary fill-in person on an on-call basis only, upon completing the following: physical assessment, get Hospital issued police uniforms, training for first aid and CPR credentials, and be sworn in by a judge, before working as a Hospital police officer.

25.     On Friday, May 8, 2020, Plaintiff was contacted and scheduled to come in to do the blood work, be advised what immunizations, etc.,to update, and to pick up a firearm.

26.     Plaintiff went to the scheduled blood work appointment, however, Assistant Chief Pompe did not keep the appointment regarding issuing a firearm to the Plaintiff.

27.     From Friday, May 8, 2020 through Tuesday, May 26, 2020, Plaintiff made numerous attempts by texts, emails, and phone messages to the Hospital human resources department and Assistant Chief Pompe, regarding setting dates to complete the necessary employment requirements,

with only one response, *i.e.*, to meet at the Hospital's police office on Wednesday, May 27, 2020.

28.     The Hospital also lost the Plaintiff's medical file.

29.     Finally, on Wednesday, 27, 2020, Plaintiff met Assistant Chief Pompe briefly at Hospital's police office to pick up some equipment, consisting of a dilapidated belt, a heavily used and dirty Smith & Wesson MP40, three (3) magazines, some ammunition, safety goggles, ear plugs, magazine pouch, a Taser case, and placed a order uniforms from a police supply store. All the issued equipment was very well used, except for the magazines which were purchased brand new from the uniform supply store.

30.     On Friday, May 29,2020, Plaintiff finally was able to contacted Mike Edger of the Hospital's human resource department who confirmed Plaintiff was to attend the Monday, June 1, 2020 employee orientation class.

31.     On Monday, June 1, 2020, Plaintiff attended the Hospital employee orientation with several people that were hired to work throughout the hospital, including two police officers.

32.     The Hospital human Resources Manager, Assistant Chief Pompe, as well as others, gave a very brief presentations on Hospital operations.

33.     Assistant Chief Pompe was insistent and emphatic that the Hospital Act 501 special police were not security guards but a police department, and that the new hire police were to act as such.

34.     The seminar was poorly run, and the class lasted approximately six (6) hours,

although the Plaintiff's paycheck reflect a full day's pay.

35.     After many conversations over a two week period via phone calls with Assistant Chief Pompe, Plaintiff was able to set up a firearms qualification test with Jim Lauria, a certified instructor, someone the Plaintiff had previously met in law enforcement circles.

36.     On June 4, 2020, Plaintiff met Jim Lauria (then or formerly the chief of police for Oakdale Borough) at the Oakdale Police Department to be tested and qualified as required by the Hospital.

37.     Lauria told Plaintiff that it really was not necessary for Plaintiff to qualify because he, in addition to being Act 120 (municipal police officer) firearms certified, was Act 235 (security guard) certified, as well as Act 49 (Constable) certified.

38.     Lauria confided that although the Plaintiff was already fully qualified, the Hospital wanted every one of its police officers to be certified so as to obtain favorable liability insurance coverage premiums.

39.     Because the weather on that day was very bad and raining heavily, (in addition to Plaintiff's Hospital issued firearm was not functioning properly because it required mechanical repairs), Lauria, while in the Oakdale Borough parking lot, signed off on the Plaintiff's qualification's sheet with a passing score of 247.

40.     Plaintiff questioned that the paperwork did not reflect the fact that Lauria and Plaintiff had not been to a firing range and that he was very uncomfortable presenting that false report;

Plaintiff was told this was completely legal.

41.     Because the firearms qualification paperwork did not accurately reflect the actions of that day, over the next few weeks Plaintiff attempted to notify Hospital human resources and Assistant Chief Pompe of his misgivings, with Assistant Chief Pompe telling Plaintiff over the phone "...Don't make waves," and to show up for work on July 3rd at 5:30 am to get his uniforms and to get sworn in.

42.     Additionally, Assistant Chief Pompe had instructed Plaintiff on three separate occasions not to associate with two former Hospital police employees Justin Gavin and William Menke, verbally denigrating these individuals professionally and personally on each occasion.

**Hospital Police Department Wrongdoings**

43.     All during this time Plaintiff was communicating with other Hospital police employees and former employees about the qualifications and professionalism of the personnel, leadership, and operations of the Hospital police department. These conversations alarmed Plaintiff. There were several categories of serious wrongdoings including: supervisors altering police reports in violation of 49 P.S. §§ 4902, 4906(a), 4910, 4911; removing drugs out of a secured  evidence or property lockup in violation of 18 P.S. § 4910 (related to tampering with or fabricating physical evidence); 18 P.S. § 5105 (related to the hindering of apprehension or prosecution); Chapter 39 violations (related to theft offenses); maintaining video surveillance in an area used by employees to change in and out of uniform in violation of 18 P.A. §§ 5701 et seq., (related to invasion of

privacy); and, 18 P.A. §§ 7501 et seq., (related to recording communications without consent).

44.     Alarmed over this information, in addition to the questionable acceptance of the fraudulent firearms qualification report, Plaintiff wanted to talk to Assistant Chief Pompe in person face to face concerning these wrongdoings.

45.     At approximately 5:40 am on Friday, July 3, 2020, Plaintiff was present at the Hospital police department. Assistant Chief Pompe was not present.

46.     While waiting for the assistant chief to show up, the other Hospital police officers related numerous occurrences of Assistant Chief Pompe's constant lying and manipulating facts, his obsession with Justin Galvin and Bill Menke (constantly focusing on Bill Menke's sexual orientation), and that Assistant Chief Pompe was always changing official police reports. These many examples solidified Plaintiff's apprehension that Assistant Chief Pompe was not to be trusted.

47.     Later when Assistant Chief Pompe arrived, he questioned why Plaintiff was at the Hospital.  He had forgotten that he had told Plaintiff to report for work that day and time.

48.     Assistant Chief Pompe complained about Plaintiff's car, and said he should be driving another vehicle, and that plaintiff's car wouldn't be accepted.

49.     Plaintiff's employment duties at the Hospital would never include the use of his personal vehicle.

50.     While in the Hospital police area that day, Assistant Chief Pompe made numerous derogatory comments about other officers and their poor performances. These comment were made

about the various officers behind their back as they came and went during the shift change.

**Plaintiff Ordered Not to Associate or Speak With Certain Individuals**

51.    Again, Assistant Chief Pompe ordered Plaintiff not to associate or have any contact with Justin Galvin and Bill Menke, continuing to make derogatory remarks about both the former Hospital police employees.

52.    After a particularly painful excoriating comment concerning Bill Menke, Plaintiff responded to Assistant Chief Pompe, "Why are you picking on him because he gay. He did his job. He's a good kid, and a good constable."

53.    After that,  the conversation turned adversarial and Assistant Chief Pompe was quickly caught in a lie.

54.    Assistant Chief Pompe implicitly threatened Plaintiff by inferring that because Plaintiff was on unemployment ..."he better be careful." (That the Plaintiff would lose his unemployment benefits.)

55.    Plaintiff clearly told Pompe that he was not going to be intimidated and/or coerced by Assistant Chief Pompe or the Hospital into doing illegal or unethical acts.

56.    Plaintiff also clearly informed Assistant Chief Pompe that he would not tolerate any individual altering his police reports, and that doing so was a criminal act; that Plaintiff was aware of the missing evidence from the property locker, and that the Hospital's protocol and procedure was appalling and substandard.

57.     The disagreement between Assistant Chief Pompe and the Plaintiff escalated when they entered locker room area. The assistant chief told the Plaintiff that he would have to lock up and leave any Hospital supplied firearm after each shift (the same firearm that had been in Plaintiff's possession for more than two (2) months). However, if the firearm was Plaintiff's, he would be able to take it to and from work, but since it belonged to the Hospital Plaintiff had to leave it there in a locker after each shift.

58.     Plaintiff reminded the assistant chief that he was an Act 120 Police Officer and a State Constable, and would need to go from one job to another after working at the Hospital, and that he could secure his weapon in a gun safe in his vehicle and/or bring his duty weapon and change on-site.

59.     The assistant chief said that would not be permissible. Plaintiff stated that it made no sense that people who own their firearm can carry it to and from and those who did not have their own firearm had to lock it on site, on top of not being able to leave their other duty weapon safely in their car.

60.     Plaintiff clearly stated his opinion that the Hospital's policy was absolutely ridiculous and created an unnecessary risk to officer safety.

61.     Plaintiff also noted to the assistant chief that he observed the camera in the locker room where Plaintiff was to change clothes, and told the assistant chief that the video camera in the locker room was illegal and that he would not be using that locker room because he did not want to

be on camera changing in and out of his uniform.

62.    Plaintiff made known his conflicts of interest to be working with Pompe because of any forthcoming civil or criminal cases because the Plaintiff being an elected official and sworn law enforcement officer, and continued informing the assistant chief of his other concerns of the Hospital's incompetence in handling the police department's evidence, falsifying firearm qualifications, illegal removal of drugs from the property locker, and that he was concerned that he would be caught up in some legal issues because of the incompetence of management of the department.

63.    Assistant Chief Pompe repeated again to Plaintiff, "Don't make waves, " and ..."to keep your fu*king mouth shut."

64.    Because it was a court holiday, the Plaintiff could not be sworn in, so he locked his firearm, Hospital ID, and the three (3) magazines in the safe on camera,  stated that he would call management to discuss his employment status on Monday, and that he the Hospital issued firearm fixed and had shot a box of rounds to test it. Plaintiff them left the Hospital workplace.

**Plaintiff Reports Department Wrongdoings to Hospital CEO**

65.    Later that same day a Hospital officer on the afternoon shift called and told Plaintiff that Assistant Chief Pompe addressed the shift change and stated that the Plaintiff was "a plant for Bill Menke," and insinuated something to the effect that the Plaintiff was Menke's boyfriend /lover.

66.    Plaintiff went to the Hospital police department office on July 7, 2020 and returned

the Hospital issued ear plugs, safety glasses, a five gallon bucket and any remaining ammunition.

These items were left in the locker room camera surveillance area.

67.    During the July 6th week, Plaintiff contacted and spoke the WHS's CEO,  Brook

Ward, who asked "to give it to him straight" the Plaintiff's misgivings and concerns regarding the

Hospital police department's wrongdoings.

68.    Plaintiff fully aired his misgivings and opinions to the Hospital CEO on the following

issues: The police department clearly has an identity crisis; the department altering reports, falsifying

evidence, or destroying evidence is a security red flag; the department cannot be run through a

civilian human resource department, it must be independent; sometimes the department, when

convenient, invokes its power and authority to  masquerade as a police department; the  majority of

the officers (more than 80%)  do not have even the basic Municipal Police Officers Training Act

120, however they are expected to conduct criminal investigations without adequate training;

although Municipal Act 120 is not a necessity to work in an Act 501 Department, the Hospital police

officers need to stick to misdemeanors and summary offenses and follow the same protocols; having

unqualified untrained individuals conducting criminal investigations is a detriment to everyone

involved especially the victim, and it's also a liability to the hospital, and the untrained police officer;

In Plaintiff's entire career he have never seen such a poorly organized operation, albeit security or

police.

69.    Plaintiff continued by describing the total incompetence and gross negligence and

malfeasance of the department leadership is the root of the problems because of the assistant chief and chief's total lack of any previous credible law enforcement experience or background had created a dangerous and hostile work environment for all involved. This is only compounded by their maliciousness and indifference and their willingness to violate statute to satisfy the Washington Healthcare System and its insurance providers.

70.     The Plaintiff concluded and summarized his opinions to the WHS CEO by explaining that these individuals (assistant chief and chief) use their titles to intimidate threaten and retaliate against anyone who tells them of their wrongdoings and shortfalls or reports their conduct to an outside law enforcement agency.

71.     The WHS CEO said he did remember speaking with Plaintiff at the orientation on June 1, 2020, and promised he would investigate the Plaintiff's misgivings and concerns of the police department's wrongdoings and get back to Plaintiff regarding his employment status.

72.     Plaintiff did not receive any follow up from the Hospital CEO, however the Plaintiff did receive a form letter in late July 2020 stating that he was terminated and that the Hospital reported him to Pennsylvania unemployment.

73.     Over the next few months, the Plaintiff contacted the Washington County District Attorney's Office, the Washington County Detectives, the Pennsylvania State Police, and spoke to a local TV news reporter, repeating what he had reported to the Hospital's CEO in paragraphs 68 through 70, above.

**Retaliation by Hospital Against Plaintiff**

74.     Over the 4th of July 2020 weekend, Plaintiff's other employer, Chief Jeff Barone ("Chief Barone"), informed Plaintiff that Pompe had called the Centerville Township Police Department a number of times, and when Chief Barone finally spoke to Pompe, Pompe wanted to know Plaintiff's employment status, and wanted to talk about Plaintiff. Chief Barone refused to discuss Plaintiff's employment at Centerville Township.

75.     Assistant Chief Pompe had no business contacting the Centerville Township police department, and it is alleged that Pompe was attempting to disparage the Plaintiff to the Centerville Township chief.

76.     Sometime in December 2020, Plaintiff received a letter dated October 30, 2020, drafted by the Hospital's attorney, Phillip J. Binotto. (*See attached*, Plaintiff's Exhibit No. 1.)

77.     The letter contained malicious and untruthful allegations of Plaintiff's wrongdoings and contained numerous misstatements of facts.

78.     The letter was also published (copied) to six (6) other individuals.

79.     The letter was published to the six (6) individuals in a calculated manner to ruin Plaintiff's opportunities of future employment in his employment field.

80.     The letter was drafted and published to libel the Plaintiff's personal and business reputation, and to create a negative employment environment in the Plaintiff's attempts to seek employment with local law enforcement employers.

81.     The letter was intentionally drafted and published in retaliation to Plaintiff's exercise of his fundamental, individual, Constitutional Right to Free Speech.

82.     The Hospital, through its employees, knew that the statements in the letter were false, or acted in a reckless disregard as to the letter's contents truth or falsity, and intended that the publication of the letter cause Plaintiff pecuniary loss.

83.     The Hospital's actions did cause the Plaintiff's professional reputation to be ruined, such that he has been effectively "blackballed" by law enforcement employers and has been unable to find employment in his field of experience.

## COUNT I

**42 U.S.C. §§ 1983, 1988**
**Unconstitutional Infringement of Civil Rights- First Amendment and Stigma Plus**

84.     All of the previous paragraphs of this pleading are incorporated herein as if set forth at length.

85.     At all times relevant to the allegations contained in this count of the complaint, the Defendant Hospital acted under *Color of the Law* within the meaning of 42 U.S.C. § 1983 and pursuant to official policies and procedures as set by the final authority of its chief of police, and/or executive officers.

86.     It is believed and therefore averred that Defendant Hospital directed its employees and legal counsel to publish and disseminate false statements in retaliation to the Plaintiff's

expression of his opinions and his reporting the existence of unlawful activity within the Hospital's police department. Defendant Hospital knew, or should have known, that these accusations were false, and that Plaintiff's speech was fully protected by his clearly established First Amendment rights.

87.    Any reasonable person would know that Plaintiff would suffer substantial harm as the result of these actions, including but not limited to the termination of his employment with the Hospital and other law enforcement employers.

88.    Plaintiff has suffered lost of employment in addition to other and future employment opportunities.

89.    Defendant Hospital violated Plaintiff's right to free speech by undertaking the actions described in all the previous paragraphs of this complaint.

90.    Defendant Hospital violated Plaintiff's right to free speech by and through its official policies and procedures as set by the final authority of its police chief, and/or executive officers.

91.    Defendant Hospital acted intentionally and with callous disregard for Plaintiff's clearly established constitutional rights, with the intention of depriving Plaintiff of those rights.

92.    As a direct and proximate result of these violations of Plaintiff's constitutional rights, Plaintiff has suffered severe and substantial damages. These damages include lost salary,

lost employee benefits, lost raises, diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, mental pain and suffering, and other compensatory damages against the Defendant, and punitive damages against the Defendant Hospital, in an amount to be determined by a jury and the Court.

### COUNT II

**Pennsylvania Common Law Civil Conspiracy to Violate First Amendment Speech Rights  and to Restrain Future Speech Pursuant to 42 U.S.C. §§1983 and 1988**

93.     All of the previous paragraphs of this pleading are incorporated herein as if set forth at length.

94.     Defendant Hospital, by and through its employees acted with a common purpose to violate Plaintiff's constitutionally protected right to speech.

95.     It is believed and therefore averred that the October 30, 2020 letter for the Hospital's counsel acted to silence the Plaintiff for whistleblowing on the Defendant's criminal activities, and its action in contravention of general and accepted public policies.

96.     It is believed and therefore averred that in causing the drafting of the October 30, 2020 letter the Defendant, through its employees, agreed  to force the Plaintiff to cease speaking out the truth using the coercive power of the Commonwealth of Pennsylvania through it police

department and/or law enforcement contacts within the regional community.

97.     It is believed and therefore averred that the letter was created and published to further the violation of Plaintiff's First Amendment rights.

98.     Defendant, by and through its employees engaged in an overt act in furtherance of punishing and silencing the Plaintiff's protected speech through the coercive power of the Commonwealth of Pennsylvania, using the coercive power of the Commonwealth of Pennsylvania through it police department and/or law enforcement contacts within the regional community.

99.     Defendant, by and through its employees, committed a tort on October 30, 2020, when they restrained Plaintiff's future constitutionally protected speech, and retaliated against him for engaging in prior constitutionally protected speech. As such, a civil cause of action exists to redress Plaintiff's claims by way of 42 U.S.C. § 1983. The Defendant, by and through its employees, is liable for the actions of its employees in furtherance of the drafting of the letter; as previously described in this Complaint.

100.    The actions taken by Defendant, by and through its employees, were the direct and proximate cause of actual and substantial damages suffered by Plaintiff. These damages include lost salary, lost employee benefits, lost raises, diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, mental pain and suffering, loss of First Amendment right to free speech, and other

compensatory and punitive damages.

## Count III -

## Violation of Whistleblower Law (43 P.S. §§ 1421-1428)

101.    All of the previous paragraphs of this pleading are incorporated herein as if set forth

at length.

102.    As set out in more detail above, Plaintiff made multiple good faith reports of

Wrongdoing both internally with the Defendant, The Washington Hospital d/b/a Washington Health

System, and externally to various law enforcement entities.

103.    The Wrongdoing Plaintiff reported was not merely technical or minimal.

104.    Instead, the Wrongdoing was criminal in nature or otherwise violated Pennsylvania

law and regulations and/or the internal codes of conduct and ethics and other rules, procedures, and

regulations of the Health System all of which were designed to protect members of the public and

the Health System itself and regulate the proper functioning of the Health System police force and

its interaction with staff and the public.

105.    For example, the Wrongdoing Plaintiff reported related to, *inter alia*:

Tampering with or fabricating physical evidence;

Hindering apprehension or prosecution;

Theft;

 Invasion of privacy; and

Unlawful recording of communications without consent.

106.    Defendant was terminated because of, and in retaliation for, his protected whistleblowing activities

107.    Defendant's retaliation has continued even after it wrongfully and unlawfully terminated Plaintiff's employment by blackballing him in his industry and community.

108.    As a result, Plaintive has suffered economic and  non-economic damages.

109.    The actions  taken  by Defendant, by and through its employees, were the direct and proximate cause of actual and substantial damages suffered by Plaintiff. These damages include lost salary, lost employee benefits, lost raises, diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, mental  pain  and  suffering, and other compensatory and punitive damages.

## COUNT  IV

### Wrongful Discharge in Violation of Public Policy   (Plead in the Alternative under Pa.R.C.P 1020 ( c)

110.    All of the previous paragraphs of this pleading are incorporated herein as if set forth at length.

111.    At all times relevant and material hereto, it was the clearly defined public policy  of

the Commonwealth of Pennsylvania for police officers to report suspected crimes and the invasion of privacy.

112.    By discharging Plaintiff from his employment because he reported suspected crimes and wrongdoing to Defendant and an outside police agency, Defendant directly violated the public policy of the Commonwealth of Pennsylvania.

113.    Given the gravity of the alleged crimes, Defendant's discharge of Plaintiff from his employment was wanton, outrageous, and in reckless disregard for Plaintiff's rights under state law.

114.    The actions taken by Defendant, by and through its employees, were the direct and proximate cause of actual and substantial damages suffered by Plaintiff. These damages include lost salary, lost employee benefits, lost raises, diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, mental pain and suffering, and other compensatory and punitive damages.

## COUNT V

### Pennsylvania Common Law Injurious Falsehood

115.    All of the previous paragraphs of this pleading are incorporated herein as if set forth at length.

116.    As set out in more detail above, Plaintiff made multiple good faith reports of Wrongdoing both internally with the Defendant and externally to law enforce agencies. In retaliation,

The Washington Hospital d/b/a Washington  Health System, made false statements internally and externally, and through a letter,  to various law enforcement entities knowing that the statements were false,

117.    The Defendant intended the false statements made  internally and externally, and by letter, to cause pecuniary loss, or reasonably recognized that the publication would result in pecuniary loss.

118.    The Defendant knew that the statements were false or acted in reckless disregard as to its truth or falsity.

119.    The actions  taken  by Defendant, by and through its employees, were the direct and proximate cause of actual and substantial damages suffered by Plaintiff. These damages include lost salary, lost employee benefits, lost raises, diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, mental  pain  and  suffering, and other compensatory and punitive damages.

## COUNT  VI

### Pennsylvania Common Law Libel

120.    All of the previous paragraphs of this pleading are incorporated herein as if set forth at length.

121.    As set out in more detail above, Plaintiff made multiple good faith reports of

Wrongdoing both internally with the Defendant and externally to law enforce agencies. In retaliation, The Washington Hospital d/b/a Washington Health System, made false statements through a letter about the Plaintiff, to various law enforcement entities knowing that the statements were false,

122.    The Defendant intended the false statements made in the letter to cause pecuniary loss, or reasonably recognized that the publication would result in pecuniary loss.

123.    The Defendant knew that the statements were false or acted in reckless disregard as to its truth or falsity.

124.    The recipients of the Defendant's letter clearly understood the published letter's meaning.

125.    The actions of publishing the letter by Defendant, by and through its employees, were the direct and proximate cause of actual and substantial damages suffered by Plaintiff. These damages include lost salary, lost employee benefits, lost raises, diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, mental pain and suffering, and other compensatory and punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendant and award the following relief:

All back pay from July 3, 2020 through the date of judgment including pre and post interest;

Front pay from the date of judgment until such time as deemed equitable and just by the court;

Damages  for economic and compensatory damages, in an amount in excess of $150,000.00;

for punitive damages against Defendant, in an amount in excess of $2,000,000.00;

for all costs and reasonable attorneys' fees pursuant to 42 USC § 1988; pre-judgment and continuing interest and

for such other relief, equitable or legal, as this Court may deem proper and just.

JURY TRIAL DEMANDED

Respectfully Submitted,

s/ Lawrence E. Bolind, Jr.
Lawrence E Bolind, Jr., Esquire
PA ID No. 44827
238 Main Street
Imperial, PA 15126-1021
(724) 695-8620
(724) 695-8621 (fax)
bolindlaw@verizon.net

April 30, 2021