**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARK A. KOLAKOWSKI, | ) | |
| | ) | No. 2:21-cv-574 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Judge Robert J. Colville |
| | ) | |
| THE WASHINGTON HOSPITAL D/B/A | ) | |
| WASHINGTON HEALTH SYSTEM, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION</u>**

Robert J. Colville, United States District Judge

Before the Court is the Motion to Dismiss (ECF No. 10) filed by Defendant Washington Hospital d/b/a Washington Health System ("WHS"). WHS seeks dismissal with prejudice of certain claims set forth in the six-count Complaint (ECF No. 1) filed by Plaintiff Mark A. Kolakowski. Specifically, WHS asserts that Count II (Conspiracy), Count III (Pennsylvania Whistleblower Law), and Count V (Injurious Falsehood) of the Complaint should be dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(6). The Court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331. WHS's Motion to Dismiss has been fully briefed, and is ripe for disposition.

## I.    Factual Background & Procedural History

This case involves Plaintiff's brief employment as a police officer with WHS, communications that were made between Plaintiff and former and current WHS employees prior to, during, and after his employment with WHS, and Plaintiff's alleged efforts to reveal alleged

deficiencies and illegal activity at WHS.  In the Complaint, Plaintiff sets forth the following factual allegations relevant to the Court's consideration of the Motion at issue:

Plaintiff is the elected Constable of Baden Borough, and is also an Act 235 and Act 120 qualified law enforcement officer.  Compl. ¶ 5, ECF No. 1.  Plaintiff is certified to carry a service weapon under Act 49 (Constables) and Act 120 (Municipal Police Officers), and has more than twenty years of experience working as a police officer.  *Id.* at ¶¶ 6-7.  WHS is a non-profit entity that "receives public funds from and through the Commonwealth by virtue of its participation in Medicare, Medicaid, and other government funded health and wellness programs, as well as funding from charitable foundations."  *Id.* at ¶¶ 10; 13.  WHS previously applied for, and Court of Common Pleas of the Washington County appointed, Assistant Chief Mark Pompe and Chief Bernard Merrick, both WHS employees, to act as Act 501 special police officers for WHS.  *Id.* at ¶ 14.  Act 501 police officers severally possess and exercise all the powers of a police officer in any county in which they may be directed to act by the corporation for which they are appointed, and are authorized to arrest persons for the commission of any offense of cruelty to children or aged persons.  *Id.* at ¶ 15.

Plaintiff applied for employment with WHS as an Act 501 police officer.  Compl. ¶ 16, ECF No. 1.  On April 28, 2020, Plaintiff was interviewed for this position by WHS employees Mike Edgar, Assistant Chief Pompe, and Chief Merrick.  *Id.* at ¶ 18.  Despite Plaintiff having been previously being advised that WHS would provide Plaintiff a five-day per week work schedule, Chief Merrick, upon learning that Plaintiff knew former WHS police officer Bill Menke professionally from their shared experience as constables, described an incident that occurred while Menke was a WHS employee, instructed Plaintiff to have no contact with Menke, and informed Plaintiff that Plaintiff could work only one or two days a month maximum, as a

temporary fill-in person on an on-call basis only, upon completion of the following: a physical assessment, acquisition of WHS-issued police uniforms, completion of training for first aid and CPR credentials, and being sworn in by a judge. *Id.* at ¶¶ 19-24.  Plaintiff subsequently attended an allegedly poorly run orientation seminar at WHS on June 1, 2020. *Id.* at ¶ 31.

On June 4, 2020, Plaintiff attended a firearms qualification test at the Oakdale Police Department with a certified instructor, who informed Plaintiff that the qualification was not necessary because Plaintiff was already qualified by way of his existing certifications, but that WHS required every one of its police officers to take a firearms qualification test so as to obtain favorable liability insurance coverage premiums.  Compl. ¶¶ 35-38, ECF No. 1.  Despite not going to a firing range due to inclement weather and mechanical issues with Plaintiff's firearm, the instructor signed Plaintiff's qualification paperwork, gave Plaintiff a passing score, and informed Plaintiff that the same was legal when Plaintiff expressed misgivings about the alleged false report. *Id.* at ¶¶ 39-40.  When Plaintiff informed human resources and Assistant Chief Pompe of his misgivings, Assistant Chief Pompe told Plaintiff "don't make waves," and instructed Plaintiff to show up for work on July 3, 2020 to be sworn in as an officer. *Id.* at ¶ 41.  Assistant Chief Pompe further instructed Plaintiff to have no contact with former WHS employees Justin Gavin and Bill Menke, and verbally criticized these individuals professionally and personally. *Id.* at ¶ 42.

During this time period, Plaintiff spoke with current and former WHS employees and learned of several alleged wrongdoings that had occurred at WHS, including:

> [S]upervisors altering police reports in violation of 49 P.S. §§ 4902, 4906(a), 4910, 4911; removing drugs out of a secured evidence or property lockup in violation of 18 P.S. § 4910 (related to tampering with or fabricating physical evidence); 18 P.S. § 5105 (related to the hindering of apprehension or prosecution); Chapter 39 violations (related to theft offenses); maintaining video surveillance in an area used by employees to change in and out of uniform in violation of 18 P.A. §§ 5701 et seq., (related to invasion of privacy); and, 18 P.A. §§ 7501 et seq., (related to recording communications without consent).

3

Compl. ¶ 43, ECF No. 1.  While waiting at WHS for Assistant Chief Pompe to arrive on July 3, 2020, other WHS police officers informed Plaintiff of wrongdoing on the part of Assistant Chief Pompe.  *Id.* at ¶ 46.  On July 3, 2020, Assistant Chief Pompe made derogatory comments about current and former WHS employees, and again instructed Plaintiff to have no contact with Justin Galvin or Bill Menke.  *Id.* at ¶ 51.

During that conversation, Plaintiff defended Menke, and an argument between Plaintiff and Assistant Chief Pompe followed, wherein Assistant Chief Pompe threatened Plaintiff's unemployment benefits, and Plaintiff informed the assistant chief of his other concerns of WHS's "incompetence in handling the police department's evidence, falsifying firearm qualifications, illegal removal of drugs from the property locker, and [Plaintiff's concern] that he would be caught up in some legal issues because of the incompetence of management of the department."  Compl. ¶¶ 51-62, ECF No. 1.  Assistant Chief Pompe again told Plaintiff to not make waves and to keep his mouth shut.  *Id.* at ¶ 63.  During the week of July 6, 2020, Plaintiff spoke with WHS's CEO and informed the CEO of Plaintiff's numerous misgivings and opinions as to deficiencies and illegal activity at WHS.  *Id.* at ¶ 68.  Plaintiff further stated that leadership, and particularly Assistant Chief Pompe and Chief Merrick, were the root of the problem due to a lack of law enforcement experience, *id.* at ¶ 69, and that the assistant chief and chief used "their titles to intimidate threaten and retaliate against anyone who tells them of their wrongdoings and shortfalls or reports their conduct to an outside law enforcement agency[,]" *id.* at ¶ 70.  Despite the CEO stating that he would investigate Plaintiff's concerns, Plaintiff received no follow-up from the CEO.  *Id.* at ¶¶ 71-72.

In late July of 2020, Plaintiff received a form letter stating that Plaintiff's employment at WHS had been terminated and that WHS had reported Plaintiff to the Pennsylvania Office of

Unemployment Compensation.  Compl. ¶ 72, ECF No. 1.  In the next several months following the termination of his employment at WHS, Plaintiff contacted the Washington County District Attorney's Office, the Washington County Detectives, and the Pennsylvania State Police, and also spoke to a local TV news reporter, repeating the misgivings and opinions that Plaintiff had previously reported to WHS's CEO.  *Id.* at ¶ 73.

Sometime in December of 2020, Plaintiff received a letter dated October 30, 2020 (ECF No. 1-2) from WHS's attorney requesting that Plaintiff cease and desist from making certain statements about WHS, the WHS police department, and Chief Merrick, and further requesting that Plaintiff retract some of those statements.  Compl. ¶ 76, ECF No. 1; ECF No. 1-2.  Plaintiff asserts that the letter "contained malicious and untruthful allegations of Plaintiff's wrongdoings and contained numerous misstatements of facts," and that WHS knew that these statements were false.  *Id.* at ¶¶ 77; 82.  Plaintiff asserts that the letter was published (copied) to six individuals in a calculated manner to ruin Plaintiff's opportunities of future employment in his employment field of law enforcement, that the letter was published in retaliation for Plaintiff's exercise of his right to free speech and to libel the Plaintiff's personal and business reputation, and that Plaintiff's professional reputation has, in fact, been ruined with law enforcement employers and that Plaintiff has been unable to find employment with law enforcement employers following the publication of the letter.  *Id.* at ¶¶ 78-83.

Plaintiff filed his Complaint on April 30, 2021.  In addition to the claims at issue in WHS's Motion to Dismiss (Count II (Conspiracy), Count III (Pennsylvania Whistleblower Law), and Count V (Injurious Falsehood)), Plaintiff also asserts the following claims: Count I (42 U.S.C. § 1983 claim for violation of Plaintiff's rights under the First Amendment); Count IV (wrongful discharge); and Count VI (libel).  WHS filed its Motion to Dismiss, along with a Brief in Support

(ECF No. 11), on July 12, 2021. Plaintiff filed a Response in Opposition (ECF No. 12) and a Brief in Opposition (ECF No. 13) on August 5, 2021. WHS filed a Reply (ECF No. 14) on August 12, 2021.

## II.    Legal Standard

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will likely prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The Supreme Court of the United States has explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 556) (internal citations omitted).

The United States Court of Appeals for the Third Circuit instructs that "a court reviewing the sufficiency of a complaint must take three steps." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). The court explained:

> First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, it should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth." Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

*Connelly*, 809 F.3d at 787. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted).

In addition to reviewing the facts contained in the complaint, a court may consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). When a document integral to or relied upon in the complaint is included, the court may also consider that document. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Although a district court is not obligated to permit leave to amend before dismissing a complaint in a non-civil rights case, *Wolfington v. Reconstructive Orthopaedic Assocs. II P.C.*, 935 F.3d 187, 210 (3d Cir. 2019), courts generally grant leave to amend unless amendment of the complaint would be inequitable or futile. *See, e.g., Bachtell v. Gen. Mills, Inc.*, 422 F. Supp. 3d 900, 915 (M.D. Pa. Oct. 1, 2019) (citing *Phillips v. Allegheny Cty.*, 515 F.3d 224, 245 (3d Cir. 2008)). "If a plaintiff requests leave to amend a complaint vulnerable to dismissal before a

responsive pleading is filed" in a civil rights case, a court must permit amendment unless it would

be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *see*

*also Grayson*, 293 F.3d at 108 ("When a plaintiff does not seek leave to amend a deficient

complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has

leave to amend within a set period of time, unless amendment would be inequitable or futile.").

## III.   Discussion

WHS seeks dismissal of Counts II, III, and V of Plaintiff's Complaint with prejudice for

failure to state a claim.  Plaintiff argues that he has set forth sufficient allegations to survive WHS's

Motion to Dismiss with respect to Counts III and V.  Plaintiff has also acknowledged the pleading

deficiencies with respect to his conspiracy claim, and has requested leave to amend his Complaint

as to Count II of the Complaint.

### A.  Count II -- Conspiracy

WHS asserts that Plaintiff's claim for "civil conspiracy" under 42 U.S.C.§ 1983 and

Pennsylvania common law at Count II should be dismissed because the allegations set forth in the

Complaint do not support a conspiracy claim.  Mot. ¶ 4, ECF No. 10.  WHS argues that Count II

should further be dismissed because, "even if they did, [WHS] is a corporation that cannot conspire

with itself[,] and the allegations do not show any conspiracy with independent third parties or

officers acting in a personal capacity." *Id*.  Plaintiff acknowledges that his civil conspiracy claim,

as currently pled, does not state a claim under Section 1983.  Br. in Opp'n 9, ECF No. 13.  Plaintiff

further requests leave to amend his Complaint to include the names of the individual employees

of WHS and the facts involving their conspiracy to violate Plaintiff's Constitutional rights. *Id.* at

10.

The two essential elements of a cause of action under 42 U.S.C. § 1983 are: "1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011) (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993)). "In order to make out a claim for conspiracy pursuant to 42 U.S.C. § 1983, a plaintiff must allege conspiracy with particularity even though a heightened pleading standard generally does not apply to civil rights actions against individual defendants." *Damiano v. Scranton Sch. Dist.*, 135 F. Supp. 3d 255, 281 (M.D. Pa. 2015) (citing *Bieros v. Nicola*, 860 F.Supp. 223, 225 (E.D. Pa. 1994)). "To plead conspiracy adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." *Damiano*, 135 F. Supp. 3d at 281 (quoting *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1166 (3d Cir. 1989), *abrogated on other grounds by Beck v. Prupis*, 529 U.S. 494 (2000)). A plaintiff must plead "enough factual matter (taken as true) to suggest that an agreement was made," in other words, "plausible grounds to infer an agreement." *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556)).

"The intracorporate conspiracy doctrine states that a corporation is incapable of conspiring with its employees when they are acting within the scope of their employment." *Mathis v. Cmty. Transp., Inc.*, No. CIV.A. 10-1399, 2011 WL 5152854, at *4 (W.D. Pa. Oct. 28, 2011) (citing *Heffernan v. Hunter*, 189 F.3d 405, 412 (3d Cir. 1999)). The United States Court of Appeals for the Third Circuit has held that the "intracorporate conspiracy doctrine applies to claims of federal civil rights conspiracy." *Shingara v. Skiles*, 274 F. App'x 164, 168 (3d Cir. 2008). The Third Circuit has explained that "a conspiracy may exist between a corporation and an officer 'if the

officer is acting in a personal, as opposed to official, capacity[,]'" and that an exception to the intracorporate conspiracy doctrine applies "when the employees have acted for their sole personal benefit and thus outside the course and scope of their employment." *Heffernan*, 189 F.3d at 412 (citation omitted); *see also Mathis*, 2011 WL 5152854, at *4 ("The intracorporate conspiracy doctrine does not protect agents of a corporation from charges of conspiracy when the agent is acting outside of his official capacity or for personal reasons or gain." (citing *Heffernan*, 189 F.3d at 412)).

Plaintiff asserts that, if given leave to amend, he will be able to set forth facts to support a claim for conspiracy that can overcome the arguments set forth in WHS's Motion to Dismiss.  Br. in Opp'n 9, ECF No. 13.  "If a plaintiff requests leave to amend a complaint vulnerable to dismissal before a responsive pleading is filed" in a civil rights case, a court must permit amendment unless it would be inequitable or futile.  *Grayson*, 293 F.3d at 108.  The Court cannot conclude, at this juncture, that amendment would be futile as to Plaintiff's conspiracy claim under Section 1983, and further finds that there is no basis to conclude that permitting amendment would be inequitable. WHS's Motion will be granted as to Count II, but the Court will dismiss Count II without prejudice and with leave for Plaintiff to file an amended complaint as to this claim.

### B.  Count III -- Pennsylvania Whistleblower Law

WHS seeks dismissal of Plaintiff's claim under the Pennsylvania Whistleblower Law at Count III of the Complaint on the basis that Plaintiff has not alleged, and cannot allege, facts that would support a finding that WHS is a "public body" that is subject to the Whistleblower Law. Mot. ¶ 5, ECF No. 10.  The Pennsylvania Whistleblower Law provides:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing,

to the employer or appropriate authority an instance of wrongdoing or waste by a
public body or an instance of waste by any other employer as defined in this act.

43 P.S. § 1423(a).  The Whistleblower Law defines employer as: "[a] public body or any of the

following which receives money from a public body to perform work or provide services relative

to the performance of work for or the provision of services to a public body: (1) An individual[;]

(2) A partnership[;] (3) An association[;] (4) A corporation for profit[;] (5) A corporation not for

profit."  43 P.S. § 1422.  In pertinent part, the Whistleblower Law defines "public body" as "[a]ny

other body which is created by Commonwealth or political subdivision authority or which is

funded in any amount by or through Commonwealth or political subdivision authority or a member

or employee of that body."  43 P.S. § 1422.

In asserting that WHS is a "public body" in his Amended Complaint, Plaintiff relies on

allegations that WHS "receives public funds from and through the Commonwealth by virtue of its

participation in Medicare, Medicaid, and other government funded health and wellness programs,

as well as funding from charitable foundations."  Compl. ¶¶ 12-13, ECF No. 1.  WHS argues that

mere receipt of government funds does not transform an otherwise private body into a public body

for purposes of the Whistleblower Law.  Br. in Supp. 8, ECF No. 11.

Initially, while Plaintiff seemingly argues that WHS's status as a non-profit entity is a

material consideration in determining whether WHS is a "public body," the Court agrees with

WHS that the same is irrelevant in this context.  The Whistleblower Law defines "public body" in

relevant part as "[a]ny other body which is created by Commonwealth or political subdivision

authority or which is funded in any amount by or through Commonwealth or political subdivision

authority or a member or employee of that body[,]" 43 P.S. § 1422, with no explicit language as

to non-profit or for-profit status.  The definition of "employer" includes both for-profit and non-

profit corporations and, had the legislature intended that non-profit status render an entity a "public

11

body," it could have, and presumably would have, affirmatively stated the same in the plain language of the Whistleblower Law.  Under the unambiguous language of the Whistleblower Law, the appropriate inquiry before the Court is constrained to determining whether Plaintiff has sufficiently alleged that WHS is funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body.

WHS argues that it is not a public body "simply because it receives funds through Medicaid and other health care programs[,]" and that "[s]uch claims have been rejected on several occasions by District Courts within the Third Circuit."  Br. in Supp. 11, ECF No. 11.  While WHS is correct that several district courts have held that receipt of Medicaid funds is insufficient to establish that an entity is a "public body" subject to the Pennsylvania Whistleblower Law, the Court notes that one such court explained that "Pennsylvania appellate courts have not addressed this issue since [*Denton v. Silver Stream Nursing & Rehab. Ctr.*, 739 A.2d 571 (Pa. Super. Ct. 1999)], and the federal courts that have contemplated the issue have been inconsistent in their choice of persuasive authority."  *Lampenfeld v. Pyramid Healthcare, Inc.*, No. 3:14-CV-0283, 2015 WL 926154, at *9 (M.D. Pa. Mar. 4, 2015); *see also Romer v. MHM Health Pros.*, No. 1:20-CV-1275, 2020 WL 6747418, at *4 (M.D. Pa. Nov. 17, 2020) ("The court recognizes that federal district courts are nonetheless split on this issue, sometimes adopting *Denton* and other times rejecting it.")).  In *Denton*, the Superior Court of Pennsylvania explained and explicitly held as follows: "Appellant alleges that appellees receive Medicaid funds through the state and that this qualifies appellees as a 'public body' for purposes of the Whistleblower Law.  We agree."  *Denton*, 739 A.2d at 576.

"In the absence of a controlling opinion from a state's highest court on an issue of state law, a federal court must predict how that court would decide the issue."  *Ellis v. Allegheny Specialty Prac. Network*, No. 2:12cv404, 2013 WL 411477, at *3 (W.D. Pa. Feb. 1, 2013).  In

doing so, a district court should give due regard, but not conclusive effect, to the decisional law of lower state courts. *Ellis*, 2013 WL 411477, at *3. "[T]he opinions of intermediate appellate state courts are not to be disregarded unless the court is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (citing *P. Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 433 (3d Cir. 2012)).

While federal district courts in this Circuit, including judges of this District, have reached different conclusions as to whether *Denton* was correctly decided and/or is still viable,[1] the Court notes that the Superior Court of Pennsylvania has recently cited favorably to the exact holding in *Denton* that is at issue in this litigation. *See Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*, 166 A.3d 465, 475 n.8 (Pa. Super. Ct. 2017) ("This Court has held that an entity that receives Medicaid funding is a 'public body' for purposes of the Whistleblower Law." (citing *Denton*, 739 A.2d at 576)); *Harrison v. Health Network Lab'ys Ltd. Partnerships*, No. 365 EDA 2018, 2018 WL 6520982, at *4 n.6 (Pa. Super. Ct. Dec. 12, 2018) (the Superior Court explaining that it "has decided that the statutory definition of 'public body' for purposes of the Whistleblower Law includes, *inter alia*, private entities which receive funding 'in any amount by or through Commonwealth[,]'" and citing *Denton* for its finding that a "recipient of Medicaid funding is [a] 'public body' for purposes of Whistleblower Law . . . .")).

The Court agrees with the analysis set forth by the United States District Court for the Middle District of Pennsylvania in *Heckman v. UPMC Wellsboro*, No. 4:20-CV-01680, 2021 WL 2826716 (M.D. Pa. July 7, 2021), wherein that court explained:

> District Courts in this Circuit have generally held that mere receipt of Medicaid reimbursements from state funds is insufficient to turn an otherwise private entity into a public body for purposes of Whistleblower Law liability. The main

---

[1] In *Denton*, the Superior Court expressly rejected the United States District Court for the Eastern District of Pennsylvania's decision in *Cohen v. Salick Health Care, Inc.*, 772 F. Supp. 1521 (E.D. Pa. 1991), a case that those courts that take issue with *Denton* frequently cite.

justifications for this rule are the statute's text, which can be read as requiring funding to come from a specific legislative appropriation (not an automatic reimbursements system), and concerns that any other interpretation would be too broad.

By contrast, the Superior Court of Pennsylvania has consistently and repeatedly ruled that the receipt of *any* Medicaid funding is sufficient to bring a private entity into the reach of the Whistleblower Law.  The Superior Court has done so on grounds that the phrase "funded in any amount" necessarily extends to all entities which "receive public monies under the administration of the Commonwealth." The Superior Court has also expressly rejected reasoning offered by federal courts in this Circuit holding to the contrary.

While the Pennsylvania Supreme Court has not yet addressed this issue directly, it recently accepted without reservation the Superior Court's interpretation for purposes of resolving a question under the Whistleblower Law.  In *Harrison v. Health Network Laboratories Limited Partnerships* [232 A.3d 674, 677 n.3 (Pa. 2020)], the Pennsylvania Supreme Court presumed as true the assertion that an entity, "as a recipient of Medicare and other forms of public assistance payments," is a "'public body' . . . as defined by the Whistleblower Law."

Given the Superior Court's consistent interpretation of the Whistleblower Law as covering entities which receive Medicaid reimbursements, and the recent decision in *Harrison*, the Court concludes it most appropriate to adopt the Superior Court's holding and reasoning.  As a result, the Court finds that an entity which receives Medicaid reimbursement is a "public body" under the Pennsylvania Whistleblower Law.  As North Penn is alleged to receive Medicaid reimbursements from the Commonwealth, the Court determines that it is a public body.

*Heckman*, 2021 WL 2826716, at *18–19 (citations omitted) (footnotes omitted); *see also Romer*, 2020 WL 6747418, at *4-6 (agreeing with the holding in *Denton* and addressing cases that rejected *Denton*).

Plaintiff alleges that WHS "receives public funds from and through the Commonwealth by virtue of its participation in Medicare, Medicaid, and other government funded health and wellness programs, as well as funding from charitable foundations."  Compl. ¶¶ 12-13, ECF No. 1.  The Superior Court of Pennsylvania has held that "an entity that receives Medicaid funding is a 'public body' for purposes of the Whistleblower Law."  *Saltzman*, 166 A.3d 465, 475 n.8 (citing *Denton*, 739 A.2d at 576).  While the Court recognizes that there exists a disagreement among federal

district courts as to the continued viability of *Denton*, the Court, for the reasons discussed above, is not convinced by other persuasive data that the Supreme Court of Pennsylvania would decide that *Denton* was erroneously decided.  Accordingly, the Court finds that Plaintiff has sufficiently alleged that WHS is a "public body" that is subject to the Pennsylvania Whistleblower Law, and, because this is the only basis for dismissal of this claim asserted in WHS's Motion to Dismiss, the Court will deny WHS's Motion to Dismiss to the extent that it seeks dismissal of Count IV.

### C.  Count V -- Injurious Falsehood

Finally, WHS asserts that Plaintiff's claim for injurious falsehood at Count V should be dismissed because "Pennsylvania law recognizes this tort only in the context of a commercial relationship involving the representation of the title and quality of another's interest in goods or property," and because the allegations set forth in the Complaint fail to state such a claim.  Mot. ¶ 6, ECF No. 10.  WHS further asserts that Plaintiff's injurious falsehood claim merely restates his libel claim.  Br. in Supp. 12, ECF No. 11.  Plaintiff argues that his claim for injurious falsehood is pled in the alternative to his claim for libel, and that it is sufficiently pled to survive at this stage of the proceedings.  Br. in Opp'n 19, ECF No. 13.  Plaintiff further argues that he has a property interest in his position as a constable, and specifically argues:

> The elected office of a state constable is unique and affords the Plaintiff business opportunities to earn money as a constable.  This flow of income received from performing constable services is reported on the Plaintiff's income tax forms as separate business income, as opposed to personal individual employee wages. Having this ability to earn income as a separate business is a property interest.

*Id.* at 17.  Plaintiff argues that WHS's alleged publication of injurious falsehoods injured Plaintiff's business reputation and damaged his ability to earn money in the business of being a constable. *Id.*

With respect to a claim for injurious falsehood, which has been described using various terms including "commercial disparagement," the United States District Court for the Eastern District of Pennsylvania has explained:

> "An action for commercial disparagement is meant to compensate a vendor for pecuniary loss suffered because statements attacking the quality of his goods have reduced their marketability, while defamation is meant [to] protect an entity's interest in character and reputation." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 924 (3d Cir. 1990); *see also Mallory v. S & S Publishers*, 168 F. Supp.3d 760, 774 (E.D. Pa. 2016) ("A claim for commercial disparagement protects economic interests related to the marketability of goods, whereas defamation involves the reputation of persons, not products.") (internal quotation marks omitted). Thus, to make out a claim for injurious falsehood (or commercial disparagement), Plaintiff must establish that (1) Defendants published a statement disparaging Plaintiff's goods or property; (2) the statement was false; (3) Defendants intended the publication to cause pecuniary loss or reasonably should have recognized that publication would result in pecuniary loss; (4) Plaintiff suffered pecuniary loss to her goods or property; and (5) Defendants acted with actual malice as to the falsity of the statement. *See* [*Pro Golf Mfg., Inc. v. Trib. Rev. Newspaper Co.*, 809 A.2d 243, 246 (Pa. 2002)].

*Ellis v. Genesis Healthcare Corp.*, No. CV 18-5536, 2019 WL 1303981, at *3 (E.D. Pa. Mar. 20, 2019); *see also Pro Golf Mfg.*, 809 A.2d at 246 ("Regardless of the label, the publication of a disparaging statement concerning the business of another is actionable where: (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity." (citing RESTATEMENT (SECOND) OF TORTS § 623(A) (1977))).

The *Ellis* court granted a motion to dismiss that sought dismissal of a plaintiff's injurious falsehood claim, and explained:

> Plaintiff's injurious falsehood claim fails because the Complaint does not contain sufficient factual allegations from which the Court can conclude that Defendants published a statement disparaging Plaintiff's goods or property. Plaintiff's injurious falsehood claim is premised on the same allegations as her defamation claim—that Defendants published a false statement to the Bureau about Plaintiff

16

> falsifying her time card and placed documents to that effect in her personnel file.
> The allegedly disparaging statements, however, do not concern Plaintiff's goods or
> property; instead, Defendants' statements concern only Plaintiff's personal
> reputation.  While Plaintiff may maintain a claim for defamation based on false
> communications that damage her reputation, those communications do not support
> a claim for injurious falsehood.

*Ellis*, 2019 WL 1303981, at *3.

In the present matter, neither party dedicates much of its efforts to addressing whether a

constable offers "goods" or whether the defamatory statements alleged in this case disparage any

"goods" Plaintiff may offer.[2]  The Court notes that the letter attached to the Complaint was copied

to the Secretary of the Pennsylvania State Constables Association, and provides:

> By way of a copy of this letter to John Nardi, Secretary of the Pennsylvania State
> Constables Association, we are advising him of your actions, and asking that the
> State Constables Association [] investigate the same and take appropriate action to
> impose sanctions on you for your conduct.  We assume the State Constables
> Association does not condone such conduct by its membership.

ECF No.1-2 at 3.  In any event, the Court finds that Plaintiff's claim for injurious falsehood is not

sufficiently pled.  Plaintiff's Complaint sets forth no allegations as to the effect that the alleged

disparaging remarks have had on his work as a constable, and thus fails to set forth sufficient

allegations as to any pecuniary loss that has resulted from such remarks.  *See Mallory*, 168 F. Supp.

3d at 775 ("Though Mallory claims she suffered 'financial loss and lost opportunity' as a result of

the alleged defamation, she does not specify what, if any, pecuniary loss resulted from the

publication of the Biography.").

For these reasons, the Court will grant WHS's Motion to Dismiss as to Count V.  Given

the limited briefing on this issue, the Court cannot conclude that amendment would be futile as to

---

[2] The Court finds that Plaintiff's arguments regarding a "property interest" in his position as a constable are inapposite, as he has set forth no allegation that WHS disparaged or misrepresented his title or interest in a purported "property interest," i.e. his position as a constable position.  The letter attached to the Complaint acknowledges his position as a constable.  *See* ECF No. 1-2 at 3.

this claim at this time.  Accordingly, the Court will dismiss Count V without prejudice and with leave for Plaintiff to file an amended complaint as to this claim.  The Court anticipates, should Plaintiff file an amended complaint setting forth a claim for injurious falsehood, and should WHS renew its attempts to dismiss such a claim, that the parties will be prepared to address in more detail the issues discussed in this Memorandum Opinion.

## IV.     Conclusion

For the reasons discussed above, the Court will grant in part and deny in part WHS's Motion to Dismiss.  An appropriate Order of Court follows.

BY THE COURT:


s/*Robert J. Colville*
Robert J. Colville
United States District Judge


DATED: March 24, 2022

cc: All counsel of record